```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

MARK TEEPLE,                     :    CIVIL ACTION
                                 :    NO. 07-2976
          Plaintiff,             :
                                 :
     v.                          :
                                 :
JOSEPH CARABBA, et al.,          :
                                 :
          Defendants.            :

                M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        DECEMBER 22, 2009

                  TABLE OF CONTENTS

I.    BACKGROUND...............................................2
      A.   Facts..............................................2
      B.   Procedural History................................23
II.   DISCUSSION..............................................24
      A.   Summary Judgment Standard..........................25
      B.   42 U.S.C. § 1983...................................27
           1.   False arrest..................................28
           2.   Malicious prosecution.........................31
           3.   Qualified immunity............................32
           4.   Probable cause................................36
      C.   Pennsylvania State Law Claims......................37
           1.   False arrest and false imprisonment...........37
           2.   Malicious prosecution.........................38
           3.   Abuse of process..............................39
           4.   Civil conspiracy..............................41
III.  KELLY'S MOTION FOR SUMMARY JUDGMENT.....................42
IV.   DYKES AND CAHILL'S MOTIONS FOR SUMMARY JUDGMENT
      A.   Probable Cause Analysis............................46
           1.   Search warrant affidavit......................47
           2.   Criminal complaint affidavit..................49
           3.   Alleged misstatements in the Affidavits.......54
           4.   Alleged omissions from the Affidavits.........59
      B.   Qualified Immunity.................................70
      C.   False Arrest/Imprisonment and Malicious Prosecution.71
      D.   Abuse of Process...................................71
      E.   Civil Conspiracy...................................72
V.    CARABBA'S MOTION FOR SUMMARY JUDGEMENT..................73
VI.   MOTIONS TO FILE REPLY BRIEFS............................74
VII.  CONCLUSION..............................................74

Before the Court are summary judgment motions filed by
each of the defendants in the above-captioned case; Defendant
Deputy District Attorney Stephen Kelly, Defendant Detective Kevin
D. Dykes, Defendant Detective William Cahill, and Defendant
Detective Joseph Carabba.  In addition, Defendant Cahill and
Defendant Dykes have filed motions to file a reply regarding
their respective motions for summary judgment.  For the reasons
set forth below, each of the Defendants motions for summary
judgment will be granted and the motions to file reply briefs
will be denied.

**I.    BACKGROUND**

A. <u>Facts</u>

On May 8, 2006, Plaintiff Mark Teeple ("Plaintiff") was
arrested and charged with solicitation to commit robbery.
Plaintiff was tried in the Court of Common Pleas of Chester
County.  On March 8, 2007, upon the close of the prosecution's
case-in-chief, Judge Phyllis R. Streitel granted Plaintiff's
motion for judgment of acquittal on the charge of solicitation to
commit robbery.  Shortly thereafter, Plaintiff commenced the
instant suit against the investigating detectives, Kevin Dykes,
William Cahill, and Joseph Carabba, and the deputy district
attorney involved with the investigation, Stephen Kelly
(collectively "Defendants"), asserting civil rights violations

under 42 U.S.C. § 1983 and the Pennsylvania Constitution, and for various torts, including malicious prosecution and false arrest.

The underlying facts which form the foundation of Plaintiff's claims are as follows. On April 11, 2006, Defendant Detective Kevin Dykes ("Dykes") received a phone call from Kevin Christie ("Christie"), a retired state police sergeant. (Dykes Dep. 40:5-41:9, June 10, 2008.) Christie informed Dykes that he received information about a potential bank robbery from an individual named Mary Jane Lofland ("Lofland"). (Id. at 41:1-43:9) Dykes was aware of an open investigation into a rash of bank robberies, in which over a half-dozen banks were robbed during an approximately six-month period. (Id. at 33:14-34:25.) Upon receiving Lofland's contact information from Christie, Dykes placed a call to Lofland and acquired information regarding an upcoming bank robbery of Commerce Bank in Westtown Township, Pennsylvania ("Commerce Bank") within the next week. (Id. at 59:24-60:19, 57:20-58:6.)[1]

Upon receiving this information on the upcoming bank robbery, Dykes contacted Defendant Detective William Cahill ("Cahill"), who is a sergeant in the Westtown-East Goshen police force. Dykes contacted Cahill because the targeted bank was located within Cahill's jurisdiction. Dykes and Cahill set up a

---

[1]     During conversations in which Plaintiff and Lofland discussed Commerce Bank in relation to this upcoming robbery they sometimes referred to it by using the codeword "Lucy."

meeting with Lofland at her residence on April 12, 2006, to inquire further about the upcoming bank robbery. Prior to this initial meeting, Dykes completed a criminal history background check of Lofland and discovered that Lofland had a prior conviction for retail theft.[2]

At this April 2006 interview, Lofland informed Dykes and Cahill that she and Plaintiff became acquainted as neighbors in their apartment complex, the Golf Club Apartments. She revealed that she had discussed potentially robbing a bank as far back as February 2006, but that recently the potential robbery was the only thing that Plaintiff talked about. (Dykes Dep. 106:19-25.) Lofland further told Dykes and Cahill that Plaintiff made comments to her indicating that he had knowledge of a robbery and shooting incident that occurred at a location known as the House of Lights in West Chester, Pennsylvania (the "House of Lights Incident"). Dykes relayed this information concerning Plaintiff's potential knowledge of the House of Lights Incident to the investigating detectives, who later informed Dykes that Plaintiff was not a suspect in that investigation.

During this initial interview, Lofland informed the detectives that Plaintiff had selected Commerce Bank as his

---

[2] Lofland had also received a citation and had an outstanding warrant for using a bad check, although the record does not indicate on what date this violation occurred. (Lofland Dep. 249:1-250:25. Sept. 15, 2008.) Cahill also had previously issued a citation to Lofland in 2005 relating to a charge of cruelty to animals. (Cahill Dep. 18:1-19:1, June 16, 2008.)

4

intended target for the robbery, which was set to occur on April 18, 2006, at approximately 2:00 p.m.; that Plaintiff concocted a plan for Lofland to report her vehicle as stolen so that it could be used in the planned robbery; and that Plaintiff requested that Lofland procure a gun for him to be used in connection with the planned robbery. (Id. at 108:7-109:10.) Lofland further revealed that Plaintiff was addicted to prescription medications and that Lofland supplied these painkillers to Plaintiff on several occasions. Lofland also provided information unrelated to the robbery scheme, such as Plaintiff forging his deceased mother's pension checks and Plaintiff owing approximately $15,000 in back taxes to the Internal Revenue Service. These unrelated incidents were not investigated by Dykes and Cahill, and Plaintiff was never charged in connection with these alleged offenses.

During the course of this April 12, 2006 interview, Lofland received a telephone call from Plaintiff, which was observed by Dykes. During this telephone conversation, Dykes overheard Plaintiff discussing the use of Lofland's vehicle with respect to a potential robbery. (Id. at 121:12-124:18.) In light of the information obtained from this initial interview, and the information overheard during Plaintiff's phone call to Lofland, Dykes and Cahill determined that it was appropriate to conduct an investigation (the "Investigation") into Plaintiff's

involvement with the potential bank robbery (the "Planned Robbery"). In furtherance of the Investigation, Dykes requested that Lofland consent to wearing wire surveillance equipment in order to have her phone and personal conversations with Plaintiff recorded. Defendant Deputy District Attorney Stephen Kelly ("Kelly") obtained Lofland's official consent to the recording of her conversations with Plaintiff.

The first successful consensual intercept occurred on April 13, 2006 (the "April 13 Intercept"), in which Dykes and Cahill recorded a phone conversation between Lofland and Plaintiff. During this conversation Lofland instructed Plaintiff to refrain from mentioning the Planned Robbery to Plaintiff's girlfriend, and Plaintiff likewise told Lofland not to discuss the Planned Robbery with her sister. (Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. K.)

On April 17, 2006, Dykes supervised a consensual intercept of in-person conversations between Plaintiff and Lofland (the "April 17 Intercept"). The April 17 Intercept recorded conversations between Plaintiff and Lofland that occurred while Lofland drove Plaintiff to Shop-Rite Supermarket, Commerce Bank (aka "Lucy," the site of the Planned Robbery), and CVS Pharmacy. The April 17 Intercept documented Plaintiff and Lofland driving around the area of Commerce Bank and referencing different aspects of the Planned Robbery, in other words

envisioning a "dry run" of the Planned Robbery. (Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. L.) Plaintiff and Lofland discussed such details as the escape route for the Planned Robbery, including the location where the getaway car would be parked, and the presence of security cameras at Commerce Bank. The following are relevant excerpts from the April 17 Intercept:

> **Plaintiff:** Now park here come out and we're running we got to walk to the truck to get in.
> **Lofland:** Are you getting in here or are you getting in the bank?
> **Plaintiff:** Up here.
> **Lofland:** All right.

(Id. at 23.)[3]

> **Plaintiff:** I don't see any cameras out here there must be though.
> **Lofland:** I don't see any either.
> **Plaintiff:** I don't see any in the window pointing out.
> **Lofland:** Unh-Unh
> **Plaintiff:** It is not too crowded but then again it's 3:45 so (inaudible).

(Id.)

The April 17 Intercept also recorded Plaintiff and Lofland discussing Lofland reporting her vehicle as stolen and then using that "stolen" vehicle to commit the Planned Robbery. Plaintiff and Lofland also discussed having Lofland obtain a rental car, park it in a secluded area and then transfer cars after using the "stolen" vehicle to commit the Planned Robbery.

---

[3] This Memorandum recites the text of the respective transcripts verbatim for purposes of consistency with the record. Therefore, certain excerpts of the transcripts include uncorrected grammatical errors.

The following are relevant excerpts from the April 17 Intercept

on this point:

> **Plaintiff:** Get in your car.
> **Lofland:** In the rental.
> **Plaintiff:** (Inaudible).
> **Plaintiff:** The only thing about that is there's no trees, the cops and see it and they say it's abandoned just look for suspects (inaudible).
> **Lofland:** It's all right I'll wait.
> **Plaintiff:** It wasn't very closed in like kind of thing that's okay.
> **Lofland:** I am going to make sure she's coming you know.[4]
> **Plaintiff:** Tomorrow's a good day.

(Id. at 25.)

> **Plaintiff:** Don't take a chance (inaudible) well once your in the rental.
> **Lofland:** So where was it, it's tomorrow.
> **Plaintiff:** Once you're in the rental you can drive like normal.
> **Lofland:** All right. So we're going to do this tomorrow?
> **Plaintiff:** I hope so.
> **Lofland:** All right so, you want me to call, call tonight to say it was stolen or first thing tomorrow morning?
> **Plaintiff:** Morning.
> **Lofland:** Morning?
> **Plaintiff:** Yeah, because . . . .
> **Lofland:** Where was it stolen at Wawa or the driveway.
> **Plaintiff:** Somebody can steal the truck and then do a bank heist.
> **Lofland:** Alright.
> **Plaintiff:** Same day.  They're not going to wait.
> **Lofland:** They're not going to wait.
> **Plaintiff:** I'm, you going to steal a car you're going to hit that bank then.  You understand?  Nobody going to steal a car the day before.

---

[4]     The term "she" in this sentence apparently is in reference to the codeword "Lucy" used by Plaintiff and Lofland to refer to the Planned Robbery.

(Id. at 25-26.)

Dykes conducted a successful consensual intercept on April 18, 2006 (the "April 18 Intercept") which recorded in-person conversations between Plaintiff and Lofland during the time in which Lofland drove Plaintiff to an appointment with the Chester County welfare office in Thorndale, Pennsylvania. During the April 18 Intercept Plaintiff and Lofland discussed their intention to report Lofland's truck as stolen in connection with the Planned Robbery as follows:

> **Lofland:** So when I call the police department to, to, uh call this in, how should I say, where should I say it was stolen at from Wawa or the driveway?
> **Plaintiff:** I think Wawa would be better.

(Defs. Mot. for Summ. J., Ex. 11.) During the April 18 Intercept, Plaintiff and Lofland also discussed purchasing blonde hair dye and electrical tape in connection with the Planned Robbery. (Id.)

Dykes was informed by Lofland that she had several conversations with Plaintiff between April 19, 2006, and May 1, 2006, however, none of these conversations were recorded. Lofland told Dykes that on April 23, 2006, Plaintiff informed Lofland that he did not want to participate in the Planned Robbery. (Dykes Dep. 282:21-283:1.) In response to Plaintiff's purported statement of withdrawal from the Planned Robbery, Lofland told Plaintiff that she had already reported her truck

stolen. (<u>Id.</u> at 283:3-5.) Lofland was instructed by Dykes to tell Plaintiff that she had already reported her truck as stolen in order to expedite the investigation. (<u>Id.</u> 283:7-294:24.)

Lofland told Dykes that on April 27, 2006, she received a phone call from Plaintiff. Lofland said that during this phone call, Plaintiff stated that he needed to obtain money for rent no later than May 5, 2006. (<u>Id.</u> at 310:1-311:20.) Plaintiff denies that this April 27, 2006 conversation occurred, but did admit that his landlord had initiated a legal action for eviction against him at that time.

On May 1, 2006, a telephone conversation between Plaintiff and Lofland was intercepted ("May 1 Intercept") in which Plaintiff stated he would participate in the Planned Robbery if Lofland provided him with Percocet pills. This arrangement is evidenced by the following excerpts of the May 1 Intercept:

> **Plaintiff**: Where you gotta go?
> **Lofland**: The doctor.
> **Plaintiff**: Where's this doctor?
> **Lofland**: Uh . . . Zuransky.
> **Plaintiff**: Oh, good ol' Zuransk?
> **Lofland**: Yeah.
> **Plaintiff**: You're gonna get some Perks out of him.
> **Lofland**: You think?
> **Plaintiff**: I know you will. Lay some over this way
> and I'll do the bank.
> **Lofland**: Oh yeah?
> **Plaintiff**: Uh huh. My vacuum and a couple of perks
> and you got it made. I was thinking about hitting
> a drug store first.
> **Lofland**: So, if I go to Zuransky and I get the
> Percocet, you'll hit the bank with me tomorrow?

10

> **Plaintiff**: I am gonna do it anyway.  But I was
> thinking about hitting a drug store first.

(Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. N 7.)[5]

Plaintiff did not state the exact date when he would commit the Planned Robbery even if Lofland provided the Percocet pills. (Id.)  The following exchange was recorded in the May 1 Intercept:

> **Lofland:** So you said if I get some Percocet
> from Zuransky you'll hit the bank with me
> tomorrow?
> **Plaintiff:** I didn't say tomorrow.
> **Lofland:** That's what you said.  Listen, I got
> it typed in my brain.
> **Plaintiff:** Well, we haven't planned a thing
> yet, so . . . .
> **Lofland:** I'm ready.

(Id. at 10.)  None of the information contained in the May 1 Intercept was included in the affidavit of probable cause later filed in support of Plaintiff's arrest.

Another conversation between Plaintiff and Lofland was recorded on May 3, 2006 (the "May 3 Intercept").  During the May 3 Intercept, Plaintiff told Lofland that "I'm scared to death. That's what's up, man.  I have to . . . we have to do this.  I have no fucking choice."  (Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. O 2.)  Plaintiff reiterated the urgency with respect to the Planned Robbery when he later stated to Lofland, "[w]e got to

---

[5]     Although Plaintiff references robbing a drug store during this conversation, Plaintiff stated in the same conversation that he was only "kidding" about this robbery.  (Id. at 11)

11

do this today or I'm screwed." (Id. at 5.)  During the May 3
Intercept, Plaintiff showed Lofland a folder that he had prepared
to use to transport the money obtained during the Planned
Robbery.  (Id. at 2-3.)  Plaintiff and Lofland also discussed
Plaintiff dyeing his hair blonde in preparation for the Planned
Robbery in order to disguise his appearance.  (Id. at 3-4.)

During the May 3 Intercept, Plaintiff also discussed
with Lofland the concept of completing a dry-run of the Planned
Robbery in order to determine the relevant timing.  Specifically,
Plaintiff stated "[w]hat I want to do is go over there and find
out how long it takes to get from there to the car."  (Id. at 4.)
Plaintiff and Lofland discussed the logistics of completing the
Planned Robbery with respect to using the rental car as a "get
away car" and reporting Lofland's vehicle as stolen.  The
following is a relevant excerpt from the May 3 Intercept:

> **Plaintiff**: This is our get-a-way car.
> **Lofland**: This is the get-a-way mobile.
> **Plaintiff**: Where are we going to park the truck?
> How are we going to get a truck?
> **Lofland**: This is our fucking ghetto mobile.
> **Plaintiff**: There something's really bothering me.
> How are you going to get the truck and put this
> over at the park.
> **Lofland**: I'm walking it.
> **Plaintiff**: The truck and the car are going to be
> far apart.
> **Lofland**: No they're not.  The park's not that far
> from me.  I'm glad you think that it is, cause
> it's not.  I've been driving this puppy all over.
> All right. 202 and 926 . . . here we come.
> **Plaintiff**: You mean the truck where it's parked
> now.
> **Lofland**: Yeah.

**Plaintiff:** You have to get this to the park. And then you're going to walk over and get the truck?
**Lofland:** No. I got . . . the plan was that I was taking the truck to the park. That's what the plan was.
**Plaintiff:** And we're going to walk over . . . .
**Lofland:** And were going to do it in this and then go in the truck and then go pick the truck up, but I'm not going to be driving a stolen truck around. Christ, that's all I need to do is get picked up in something like that. Then what am I going to say, "Mr. Officer, I'm sorry, I made a mistake?"
**Plaintiff:** Say you just found it.
**Lofland:** You think he's going to buy that one from me?
**Plaintiff:** Yeah.
**Plaintiff:** Well, I thought we were doing the job in the truck.
**Lofland:** We are.
**Plaintiff:** Well, that's what I mean. You're not following me here. The truck's over here. We gotta park the car over here.
**Lofland:** Yeah. The truck's going to be at the park. I'm going to pick you up in the rental car, drop the rental car off at the park and then go and leave the park with the stolen truck . . . .
**Plaintiff:** How are you going to get the truck to the park? You are?
**Lofland:** Right.
**Plaintiff:** O.k. That's all you had to say.

(Id. at 7-8.) During the course of the May 3 Intercept, Plaintiff suggested the idea of reporting a bank robbery at a separate bank location to divert the attention of the police from the Planned Robbery. (Id. at 20.) Specifically, Plaintiff stated:

They might have them [the bank tellers] that way on purpose. It's a good idea to prevent theft. Is there another bank near there but not in that same area? We could call in that somebody's robbing the bank and as you're doing that I'll do this one. Somewhere like a mile down where they can all head for that one?

13

(Id.)

During the May 3 Intercept, Plaintiff showed Lofland a toy gun that he had placed tape on in order to make it appear real for use in the Planned Robbery. This is evidenced by the following exchange:

> **Plaintiff:** Got to have food stamps in. You know? MJ, I got to know. Don't just say it looks real. I need to know if it really does.
> **Lofland:** It does look real.
> **Plaintiff:** Is there anything else that I should do to it. I taped up the front. I'm gonna leave it in there.
> **Lofland:** From looking here, yeah, it looks real.
> **Plaintiff:** Does it?
> **Lofland:** Yeah.
> **Plaintiff:** Liam brought that over yesterday.
> **Lofland:** Did he?
> **Plaintiff:** I grabbed it. I taped it up.

(Id. at 5-6.) Plaintiff later voiced his concern over whether the toy gun looked sufficiently realistic, stating that "I hope she [the bank teller] thinks that gun's real . . . [w]ell, cause if she doesn't, I'm out of there so fast . . . ." (Id. at 8.) Plaintiff also told Lofland that he would wear khakis pants and sneakers so that he could easily remove them and dispose of them after the Planned Robbery. (Id. at 25.) Plaintiff further stated that he expected to get "at least $40,000" from the Planned Robbery. (Id. at 26.)

On May 8, 2006, Lofland arrived at Plaintiff's apartment in order to carry out the Planned Robbery. (Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. S.) Lofland relayed to Dykes

14

that Plaintiff was still in the process of dyeing his hair blonde, that Plaintiff instructed her to bring a change of clothes, and that Plaintiff prepared a demand note for the Planned Robbery on his computer. (Id.)  Lofland further told Dykes that Plaintiff requested that Lofland provide him with more Vicodin before performing the Planned Robbery, and when Lofland refused to provide the Vicodin, Plaintiff told her that he would not go through with the Planned Robbery. (Id.)  No consensual intercept was conducted during this time, due to the fact that Plaintiff did not leave his apartment to get in either of the vehicles where the electronic surveillance equipment had been set up.

In light of all this available information, on May 8, 2006, Detective Joseph Carabba ("Carabba"), another detective with the West Goshen Township Police Department, prepared an Affidavit of Probable Cause in support of a search warrant for Plaintiff's apartment (the "Search Warrant Affidavit").  The Search Warrant Affidavit set forth the following information in support of the search warrant:

> (2) West Goshen Twp Police, working with Chester County Detectives and Westtown/East Goshen Police, learned that Mark Teeple was planning to rob the Commerce Bank on this date [May 4, 2006]. The bank is located at 1159 Wilmington Pike, in Westtown Twp, Chester County, Pa.

> (3) The above information was received from a friend of Teeple's Maryjane Lofland, Lofland has known Teeple since August, 2005.

15

Lofland has been to Teeple's apartment, 1100 West Chester Pk, G1, West Goshen Twp. Teeple would talk about a robbery and shooting that happened a few years ago, across from Golf Club Apartments at the House of Lights. Lofland also reported that over the past few years Teeple has been receiving and forging pension checks that are mailed to his mother, Doris Teeple, who is deceased. Teeple has been forging and depositing these General Electric pension checks into his account at Commerce Bank at the West Goshen branch on Market Street.

(4) Lofland told police that in February, 2006, Teeple first started talking about robbing a bank. Teeple specifically has discussed robbing the Commerce Bank in Westtown Township. Teeple has solicited Lofland to assist in the bank robbery, asking her to drive the vehicle. Teeple has discussed using a toy gun from his apartment, wrapped in black tape, to commit the bank robbery. Teeple has told Lofland that she will drive him to the bank, he will enter that bank with the toy gun and announce the robbery. Teeple will then carry the money out by hand. Lofland reports that Teeple plans to dye his hair blonde. Lofland also reported that Teeple has been researching banks on the computer, internet, in preparation for a bank robbery.

(5) On 4/17/2006, @ 2:32 PM, a consensual intercept was conducted during which time body wire equipment was placed on Lofland and activated. Police surveillance was conducted on Teeple and Lofland as they drove from the apartment complex to the Shop Rite, West Chester Pk, West Goshen Twp. Teeple advised Lofland that he needed to get the hair dye and the electrical tape, but he did not have any money. He did not purchase these items at this time. Lofland then drove Teeple to Oakbourne Park, Westtown Twp. Lofland drove Teeple to the park to check it out as a possible location to park the rental vehicle and change vehicles, after the bank robbery. Lofland then drove Teeple through the Pleasant Grove housing development, near the above Commerce Bank. This was the route taken by Lofland to go to the Commerce Bank. Once at the bank, Teeple had Lofland park her vehicle on the north side of

the bank.  Teeple instructed Lofland that this is
where he wanted her to park at the time of the
robbery, because there were no windows on that
side of the bank.  Teeple and Lofland remained in
the parking lot of the bank for approximately
three minutes watching the activity.  Lofland then
drove Teeple back to his apartment where she
dropped him off.

Teeple discussed with Lofland that his
plans were to drop off Zachary [Teeple's son] at
school at 12:30 PM, return home and dye his hair
and have Lofland pick him up at 1:45 PM.  Teeple
advised Lofland that he wanted to do the robbery
no later than 2:00 PM.  Teeple also advised
Lofland that she should report her truck stolen
the next morning from her driveway.  Teeple told
Lofland that he would purchase the hair dye and
the electrical tape later that evening.  Later
that date Teeple informed Lofland that he was not
going to do the robbery tomorrow he had an
appointment.

(6) On 4/18/2006 police conducted
surveillance on Lofland and Teeple as Lofland
drove Teeple to the Eckerd Drugstore, located at
3807 E. Lincoln Hwy, Thorndale, Pa.  Once in the
store, @ 2:39 PM, Teeple asked Lofland what color
hair dye should be purchase.  Teeple and Lofland
agreed that Teeple should purchase the
California/White blonde.  Teeple then asked the
store clerk if they sold electrical tape and the
clerk directed him to where it was located.  At
approximately 2:50 PM Lofland and Teeple departed
the Eckerd Drug Store.  It was during this time
that officers observed Teeple carrying a small
plastic bad, placing the receipt in it.  During
their travel back to Teeple's apartment, Teeple
suggested Lofland report her truck stolen from the
Wawa in West Chester.  When they returned to
Teeple's apartment officers observed Teeple enter
his apartment carrying the same plastic bag that
he was seen with leaving the Eckerd Drug Store.

(7) On 4/22/2006 Teeple contacted
Lofland and discussed looking through his son's
toy guns and finding one that he could use for the
bank robbery.  Teeple told Lofland that he
believes that he found one of his son's water guns

that he can use.  Teeple told Lofland that he was
excited about dying his hair blonde.  Teeple also
discussed and joked with Lofland about the type of
teller he would approach at the time of the
robbery.

(8) On 5/3/2006 Teeple against discussed
plans with Lofland to rob a bank.

(9) your affiant believes these facts to
be true and requests a search warrant for 1100
West Chester Pike, apartment G1, West Goshen Twp,
Chester County, Pa. to seize any and all evidence
of the crime of robbery, including hair dye and
packaging, black electrical tape and receipts for
purchases of these items, computers, firearms and
replicas of firearms, notes which would be
presented during the bank robbery, documents which
show occupancy of the apartment and any and all
documents associated with Commerce Bank, including
account information.

(10) On 5/8/2006 Lofland again met
Teeple at his apartment.  Lofland reported that
Teeple's hair was dyed blonde and he told her that
he had a demand note which he typed on the
computer and printed out.  Lofland saw the demand
note and gun in the apartment, as well as the hair
dye and gloves in the bathroom.  Teeple was
planning on robbing the bank today.

(Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. F.)  A search

warrant was approved and executed on May 8, 2006.  Defendants

served the search warrant on Plaintiff at his apartment and took

him into custody.

Upon executing the search warrant, Dykes, Cahill, and

Carabba obtained the following items from Plaintiff's apartment:

(1) a silver plastic pistol with black tape; (2) a Commerce Bank

negative balance note; (3) Scotch brand black electrical tape;

(4) a paper with writing that is a map of Route 202 Pennsylvania;

(5) a printed bank robbery demand note; (6) a L'Oreal bleach blonde hair dye box; (7) a pair of clear rubber gloves; and (8) a black folder-zipper opening. (Defs.' Mots. for Summ. J., Ex. 1.)

On May 9, 2006, Defendants Dykes and Cahill drafted a Criminal Complaint and Affidavit of Probable Cause (the "Criminal Complaint Affidavit," and together with the Search Warrant Affidavit, the "Affidavits") charging Plaintiff with (1) criminal solicitation to commit armed robbery and (2) criminal solicitation to deliver a controlled substance. The Criminal Complaint Affidavit states:

> (2) Chester County Detectives working in conjunction with Westtown-East Goshen Police Department and West Goshen Police Department began conducting an investigation on April 12, 2006, that Mark Teeple was planning to rob the Commerce Bank, within the next week or two. The above information was received from a former neighbor/friend of defendant, MaryJane Lofland. Lofland has known the defendant since approximately August 2005. Lofland has frequented the defendant's apartment, 1100 West Chester Pike, Apt. G-1, West Goshen Twp. On several occasions the defendant talked about a robbery and shooting that happened a few years ago, across the street from Golf Club Apartments, at the House of Lights.
>
> (3) On this same date, at approx. 11:30 AM, this Officer and Sergeant Cahill met with Mary Jane Lofland. These officers interviewed Lofland about the information that she has and Lofland provided the following details.
>
> (4) Lofland told police that in February, 2006 Teeple first started talking about robbing a bank. Teeple specifically has discussed robbing the Commerce Bank in Westtown Township. Teeple has solicited Lofland to assist in the bank robbery, asking her to drive the vehicle. Teeple

19

has discussed using a toy gun from his apartment, wrapped in black tape, to commit the bank robbery. Teeple has told Lofland that she will drive him to the bank, he will enter that bank with the toy gun and announce the robbery. Teeple will then carry the money out by hand. Lofland reports that Teeple plans to dye his hair blonde. Lofland also reported that Teeple has been researching banks on the computer, internet, in preparation for a bank robbery.

(5)     On 4/17/2006, @ 2:32 PM, a consensual intercept was conducted during which time body wire equipment was placed on Lofland and activated. Police surveillance was conducted on Teeple and Lofland as they drove from the apartment complex to the Shop Rite, West Chester Pk, West Goshen Twp. Teeple advised Lofland that he needed to get the hair dye and the electrical tape, but he did not have any money. He did not purchase these items at this time. Lofland then drove Teeple to Oakbourne Park, Westtown Twp. Lofland drove Teeple to the park to check it out as a possible location to park the rental vehicle and change vehicles, after the bank robbery. Lofland then drove Teeple through the Pleasant Grove housing development, near the above Commerce Bank. This was the route taken by Lofland to go to the Commerce Bank. Once at the bank, Teeple had Lofland park her vehicle on the north side of the bank. Teeple instructed Lofland that this is where he wanted her to park at the time of the robbery, because there were no windows on that side of the bank. Teeple and Lofland remained in the parking lot of the bank for approximately three minutes watching the activity. Lofland then drove Teeple back to his apartment where she dropped him off.

Teeple discussed with Lofland that his plans were to drop off Zachary [Teeple's son] at school at 12:30 PM, return home and dye his hair and have Lofland pick him up at 1:45 PM. Teeple advised Lofland that he wanted to do the robbery no later than 2:00 PM. Teeple also advised Lofland that she should report her truck stolen the next morning from her driveway. Teeple told Lofland that he would purchase the hair dye and the electrical tape later that evening. Later

that date Teeple informed Lofland that he was not going to do the robbery tomorrow he had an appointment.

(6) On 4/18/2006 police conducted surveillance on Lofland and Teeple as Lofland drove Teeple to the Eckerd Drugstore, located at 3807 E. Lincoln Hwy, Thorndale, Pa. Once in the store, @ 2:39 PM, Teeple asked Lofland what color hair dye should be purchase. Teeple and Lofland agreed that Teeple should purchase the California/White blonde. Teeple then asked the store clerk if they sold electrical tape and the clerk directed him to where it was located. At approximately 2:50 PM Lofland and Teeple departed the Eckerd Drug Store. It was during this time that officers observed Teeple carrying a small plastic bad, placing the receipt in it. During their travel back to Teeple's apartment, Teeple suggested Lofland report her truck stolen from the Wawa in West Chester. When they returned to Teeple's apartment officers observed Teeple enter his apartment carrying the same plastic bag that he was seen with leaving the Eckerd Drug Store.

(7) On 4/22/2006 Teeple contacted Lofland and discussed looking through his son's toy guns and finding one that he could use for the bank robbery. Teeple told Lofland that he believes he found one of his son's water guns that he can use. Teeple told Lofland that he was excited about dying his hair blonde. Teeple also discussed and joked with Lofland about the type of teller he would approach at the time of the robbery.

(8) On 5/3/2006, Teeple contacted Lofland and discussed doing a dry run to Oakbourne Park where they would change vehicles and to the Commerce Bank to case it out again. Teeple told Lofland that he wanted to go in the bank, as if he was using the Mac machine to get a look at the tellers, so he could choose the one he wanted to approach at the time of the robbery. At approx. 1:40 PM, a consensual intercept was conducted during which time body wire equipment was placed on Lofland and activated. Police surveillance was conducted on Teeple and Lofland as they drove from the apartment complex. Prior to leave Teeple's he

showed Lofland the toy gun that he was going to use and the folder he was going to carry to put the money in. Teeple had Lofland drive him directly to the bank after getting gas at the Lukoil gas station located across the street from the Commerce Bank. Teeple had Lofland park the vehicle in the parking lot on the north side of the bank. Teeple got out of the vehicle and entered the lobby of the bank where the Mac machine is located. Teeple was observed appearing as if using the Mac machine. Teeple was then observed opening the doors of the bank looking at the tellers. After a few second, Teeple came out of the bank and got back into Lofland's vehicle. Teeple told Lofland to drive him to the park, so he could determine the amount of time it would take them to get to the park and change vehicles. Once they arrived at the park Teeple instructed Lofland where to park the vehicles. Teeple then had Lofland drive him back to his apartment, timing it as well. Once back Teeple and Lofland arrived back at his apartment Teeple told Lofland that taking the clothing he wears to do the robbery and throwing them in the dumpster. Teeple told Lofland that he plans to do the robbery tomorrow 5/4/2006.

(9) On 5/4/2006, Teeple contacted Lofland and told her that he could not do the bank robbery this date, because his son Zachary was sick.

(10) On 5/7/2006, Teeple contacted Lofland several times and discussed the details of doing the bank robbery tomorrow 5/8/2006.

(11) On 5/8/2006, Teeple contacted Lofland several times and told Lofland that he had no other chose [sic], but to do the robbery this date. Teeple told Lofland to pick him up at this apartment at 1:00 PM, and he would have his hair dyed. When Lofland arrived at Teeple's apartment he was in the process of still dying his hair. Teeple had Lofland assist him with dying his hair. Teeple then had Lofland take a change of clothes and put them in the vehicle. Teeple prepared a demand note on his computer, while Lofland waited for him. Teeple told Lofland that he had taken 25 vicodin since yesterday and needed more before he

could do the robbery. Teeple asked Lofland to get him some vicodin. When Lofland refused to get Teeple more vicodin he became hostile and told Lofland that he was not going to do the robbery unless Lofland got him the vicodin. Teeple told Lofland to leave when she refused to get him the vicodin.

(12) On this same date, Det. Joseph Carabba, West Goshen Twp. Police Department obtained and executed a search warrant for Teeple's apartment. Obtained during the execution of the search warrant were several items, a toy gun wrapped in black tape, a bank robbery demand note, a hand written map of Rt. 202 and Please Grove Rd., empty hair dye box/container, rubber gloves, black leather folder and computer.

(Id.) The Criminal Complaint Affidavit was approved by a District Justice and Plaintiff was arrested and charged. Plaintiff eventually was acquitted of all criminal charges with respect to the Planned Robbery.

B. Procedural History

On July 19, 2007, Plaintiff filed his complaint, which was subsequently amended on September 26, 2007, alleging the following: (1) a violation of 42 U.S.C. § 1983; (2) a violation of civil rights under Article I, section 8 of the Pennsylvania Constitution; (3) false arrest; (4) false imprisonment; (5) malicious prosecution; (6) abuse of process; and (7) civil conspiracy.

The gist of Plaintiff's complaint is that he was entrapped by Defendants and that they omitted exculpatory evidence in the preparation of Criminal Complaint and the

Affidavits.  Plaintiff asserts that the Affidavits omitted
several statements by Plaintiff indicating that he was
unenthusiastic about the Planned Robbery and/or completely
renounced the Planned Robbery.  Plaintiff further contends that
all his statements and actions indicating that he was in
agreement with the Planned Robbery were merely an attempt to
string along Lofland with the aim of obtaining prescription pain
medications.  Plaintiff submits that in light of Defendants'
knowledge of this information, Plaintiff's arrest and prosecution
were improper.

On November 8, 2007, the Court entered an Order
dismissing Count Two of Plaintiff's amended complaint concerning
his claim under the Pennsylvania Constitution and dismissing all
claims against Defendant Kelly except to the extent that the
amended complaint alleged Kelly's participation in investigatory,
as opposed to prosecutorial, misconduct.

All of the Defendants filed motions for summary
judgment, each of which is addressed below.


## II.  DISCUSSION

Defendants have filed four separate motions for summary
judgment, asserting a variety of grounds for judgment.

A.  <u>Summary Judgment Standard</u>

Pursuant to Federal Rule of Civil Procedure 56(c), a

motion for summary judgment will be granted, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001).  The "mere existence" of disputed facts is insufficient to defeat a motion for summary judgment, rather a showing of a genuine issue regarding a material fact is required.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis added).

A factual dispute is deemed to be "material" where its resolution might affect the outcome of the case pursuant to the applicable law.  Id. at 248 ("As to materiality, the substantive law will identify which facts are material.")  In order to find that a "genuine" dispute exists, there must be a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict in favor of the non-moving party.  Id. at 248; Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  All inferences must be drawn in the light most favorable to the nonmoving party.  Pa. Prot. & Advocacy, Inc. v. Pa. Dept. of Pub. Welfare, 402 F.3d 374, 379 (3d Cir. 2005) ("We are required to review the record and draw inferences in a light most favorable to the nonmoving party . . . yet the nonmoving party must provide

admissible evidence containing 'specific facts showing that there is a genuine issue for trial.' " (quoting Fed. R. Civ. P. 56(e)).

It is inappropriate at the summary judgment stage for a court to resolve factual disputes or make credibility determinations, however, a court is not required "to turn a blind eye to the weight of the evidence." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (noting that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts") (internal citation omitted). Summary judgment is appropriate where the non-moving party only presents evidence that is "colorable" or "not significantly probative." Anderson, 477 U.S. at 249-50; see Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993) (recognizing that the non-moving party must provide more than a "mere scintilla" of evidence, but is not required to match each item of evidence relied upon by the moving party).

Upon a showing by the moving party that the claims of the non-moving party cannot be supported by the available evidence, the non-moving party must go beyond the allegations contained in the complaint and through the use of its "own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that

there is a genuine issue for trial." <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 324 (1986) (internal quotations and citation
omitted). "Such affirmative evidence-regardless of whether it is
direct or circumstantial-must amount to more than a scintilla,
but may amount to less (in the evaluation of the court) than a
preponderance." <u>Saldana</u>, 260 F.3d at 232 (quoting <u>Williams v.
Borough of West Chester</u>, 891 F.2d 458, 460-61 (3d Cir. 1989)).

    B.   <u>42 U.S.C. § 1983</u>

      Section 1983 provides a private right where a state
actor deprives a plaintiff of the "rights, privileges, or
immunities" secured by the Constitution and laws of the United
States. <u>Nextel Partners, Inc. v. Kingston Tp.</u>, 286 F.3d 687,
693-94 (3d Cir. 2002). "To establish liability under 42 U.S.C. §
1983, a plaintiff must show that the defendants, acting under
color of law, violated the plaintiff's federal constitutional or
statutory rights, and thereby caused the complained of injury."
<u>Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.</u>, 574 F.3d
214, 219 (3d Cir. 2009) (quoting <u>Elmore v. Cleary</u>, 399 F.3d 279,
281 (3d Cir. 2005)).

      Section 1983 provides in part:

> Every person who, under color of any
> statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District
> of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or
> other person within the jurisdiction thereof to
> the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws,

> shall be liable to the party injured in an
> action at law, suit in equity, or other proper
> proceeding for redress.

42 U.S.C. § 1983.  Here, there is no dispute that Defendants were
acting under color of law in that they were acting within the
scope of their official duties.  See generally Barna v. City of
Perth Amboy, 42 F.3d 809, 820-21 (3d Cir. 1994) ("[A]cts of a
state or local employee in her official capacity will generally
be found to have occurred under color of state law.") (internal
citations omitted); Griffin v. Maryland, 378 U.S. 130, 135 (1964)
("If an individual is possessed of state authority and purports
to act under that authority, his action is state action.");
Screws v. United States, 325 U.S. 91, 111 (1945) ("Acts of
[police] officers who undertake to perform their official duties
are included whether they hew to the line of their authority or
overstep it.").  Therefore, this Memorandum focuses on the
question of whether Defendants violated Plaintiff's Fourth
Amendment rights.

### 1.    False arrest

The Fourth Amendment requires that arrest warrants be
based "upon probable cause, supported by Oath or affirmation"
Const. Amend IV; Kalina v. Fletcher, 522 U.S. 118, 130 (1997).
The Supreme Court has held that there is "a presumption of
validity with respect to the affidavit supporting [a] search
warrant."  Franks v. Delaware, 438 U.S. 154, 171 (1978).  This

presumption of validity applies with equal force to arrest

warrants.  See Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000).

Therefore, in order to rebut this presumption and successfully

assert a § 1983 claim for a Fourth Amendment violation due to a

false arrest, a plaintiff is required to prove that (1) the

officer "knowingly and deliberately, or with a reckless disregard

for the truth, made false statements or omissions that create a

falsehood in applying for a warrant;" and (2) that "such

statements or omissions are material, or necessary, to the

finding of probable cause."  Wilson, 212 F.3d at 786-87 (internal

quotation marks and citations omitted); see also, Franks, 438

U.S. at 171 (1978); Sherwood v. Mulvill, 113 F.3d 396, 399 (3d

Cir. 1997).  In conducting this analysis, it is important to

establish from the outset that an officer is not obligated to

include every single fact unearthed or procedure used during the

course of a criminal investigation.  See Wilson, 212 F.3d at 787.

Proving reckless disregard for the truth requires more

than a mere showing of "negligence or innocent mistake."  See id.

(quoting United States v. Davis, 617 F.2d 677, 694 (D.C. Cir.

1979)).  The Third Circuit has established the standard for a

finding of "reckless disregard for the truth" for both

misstatements and omissions as follows:

> In evaluating a claim that an officer both
> asserted and omitted facts with reckless
> disregard for the truth, we hold that: (1)
> omissions are made with reckless disregard for

> the truth when an officer recklessly omits facts
> that any reasonable person would know that a
> judge would want to know; and (2) assertions are
> made with reckless disregard for the truth when
> an officer has obvious reasons to doubt the
> truth of what he or she is asserting.

Id. at 783.

Even if the party asserting the violation can prove that a misstatement or omission was made with reckless disregard for the truth, the second step of the Franks analysis requires that party still bear the burden by a preponderance of the evidence of showing that a hypothetical corrected affidavit does not support a finding of probable cause, i.e., that the deficiency alleged was material to a finding of probable cause. Id. at 788; see Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 789 (3d Cir. 2000).

In order to determine whether the deficiencies alleged in an affidavit are material, the Court is directed to employ two separate, but interrelated, tests. With regard to alleged misstatements, the affidavit is to be reviewed after the supposed falsehoods are excised. Wilson, 212 F.3d at 789; Sherwood, 113 F.3d at 400. In determining the materiality of an alleged omission, the court must remove the "falsehood created by an omission by supplying the omitted information to the original affidavit" and then review the "corrected" affidavit to ascertain whether probable cause still exists. Wilson, 212 F.3d at 789; Sherwood, 113 F.3d at 400.

2.  Malicious prosecution

As with claims for false arrest and false
imprisonment, a malicious prosecution claim under § 1983
requires a showing that the arrest, physical restraint, or
prosecution was initiated without probable cause.  To prove
malicious prosecution under § 1983 when the claim is asserted
under the Fourth Amendment, a plaintiff must show that: (1) the
defendant initiated a criminal proceeding; (2) the criminal
proceeding ended in his favor; (3) the defendant initiated the
proceeding without probable cause; (4) the defendant acted
maliciously or for a purpose other than bringing the plaintiff
to justice; and (5) the plaintiff suffered deprivation of
liberty consistent with the concept of seizure as a consequence
of a legal proceeding.  Kossler v. Crisanti, 564 F.3d 181, 186
(3d Cir. 2009); Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir.
2007).  "Malicious prosecution differs from false arrest
inasmuch as '[a] claim for false arrest, unlike a claim for
malicious prosecution, covers damages only for the time of
detention until the issuance of process or arraignment, and not
more." Johnson, 477 F.3d at 82 (quoting Montgomery v. De
Simone, 159 F.3d 120, 126 (3d Cir. 1998)).

As each of these elements must exist in order to make
out a claim, the Third Circuit has made it abundantly clear that
the existence of probable cause with respect to a charged

offense negates a claim for malicious prosecution.  See e.g.,
Johnson, 477 F.3d at 82; Wright v. City of Phila., 409 F.3d 595,
603-04 (3d Cir. 2005) (explaining that in order "[t]o prevail on
[a malicious prosecution] claim, [the plaintiff] must show that
the officers lacked probable cause to arrest her"); Barna, 42
F.3d at 820-21.  Thus, as is the case with Plaintiff's false
arrest claim, the Court is required to discern whether probable
cause existed based on the totality of circumstances in
addressing the malicious prosecution claim.

      3.   Qualified immunity

      In light of the fact that Defendants are state
officials who are eligible for a qualified immunity defense,
Plaintiff has an additional burden to succeed on the section
1983 claims.  Wilson, 212 F.3d at 786.  The doctrine of
qualified immunity serves to shield government officials "from
liability for civil damages insofar as their conduct does not
violate clearly established statutory or constitutional rights
of which a reasonable person would have known."  Harlow v.
Fitzgerald, 457 U.S. 800, 818 (1982).  This doctrine has
developed to balance the interest of upholding accountability of
public officials in exercising power irresponsibly with the
interest in protecting officials from liability when they
execute their duties reasonably.  Pearson v. Callahan, 129
S.Ct. 808, 815 (2009).  The defense of qualified immunity

extends to a police officer's violation of the Fourth Amendment.
See id.

The balance of interests struck by the doctrine of qualified immunity demonstrate that it is intended "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Hope v. Pelzer, 536 U.S. 730, 739 (2002). Therefore, qualified immunity shields police officers in the ordinary exercise of their discretionary duties. This protection, however, is forfeited where the action complained of is in contravention of "clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 614 (1999) (quoting Harlow, 457 U.S. at 818).

In Saucier v. Katz, 533 U.S. 194 (2001), limited by Pearson v. Callahan, 129 S.Ct. 808, 815 (2009), the Supreme Court articulated a two-step test that is appropriate in most situations for determining whether a government official, such as a police officer, is entitled to qualified immunity. Under the Saucier framework, the first step is for the court to address whether "the officer's conduct violated a constitutional right [.]" Saucier, 533 U.S. at 201; see also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (noting that the first question to be asked by a court in confronting a qualified immunity question is: "[t]aken in the light most favorable to the party

asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?").  If the Court finds that a constitutional violation has occurred, then the Court proceeds to the second step.  The inquiry in the second step is whether the right that was violated was "clearly established," meaning that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202.  This inquiry is to be addressed in light of the specific context of the case at hand, and not decided as a general proposition.  Id. at 201.

Thus, under the Saucier framework the first step addresses whether the action taken was violative of a constitutional right, whereas the second step addresses whether the officer made a reasonable mistake about the constitutional constraints of his actions and is entitled to protection from liability.  Whether a right was clearly established at the time of the alleged violation and whether an officer's conduct was reasonable is a matter of law for the court to decide.  Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007) (reiterating that the issue of whether an officer made a reasonable mistake of law and is entitled to qualified immunity is a question of law that is to be answered by the court); see also Bartholomew v. Pennsylvania, 221 F.3d 425, 428 (3d Cir. 2000).

Recently, the Supreme Court in Pearson limited the

34

reach of the <u>Saucier</u> framework and held that it is not the mandatory procedure that courts must adhere to in determining whether application of the doctrine of qualified immunity is appropriate. <u>Pearson</u>, 129 S.Ct. at 818. The Supreme Court made clear, however, that the <u>Saucier</u> test should dispensed with only in instances where application of the complete procedure would squander judicial resources, and recognized that use of the <u>Saucier</u> test is "often beneficial." <u>Id.</u> The Court concludes that this case represents an instance where application of the two-step <u>Saucier</u> framework is appropriate.

Consistent with the guidelines provided by <u>Saucier</u>, the Third Circuit has recognized that where a finding of probable cause exists, the doctrine of qualified immunity shields public officials. <u>See e.g.</u>, <u>Gilles v. Davis</u>, 427 F.3d 197, 205 (3d Cir. 2005) (finding that under the second step of the <u>Saucier</u> analysis, "a police officer is entitled to qualified immunity unless it would have been clear to a reasonable officer there was no probable cause to arrest"). Therefore, as long as probable cause supports a police officer's action under the Fourth Amendment, the defense of qualified immunity is applicable.

4.    Probable cause

"[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are

sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995). The standard "requires more than mere suspicion; however, it does not require that the [defendant] have evidence sufficient to prove guilt beyond a reasonable doubt." Id. at 482-83. In determining whether an arrest was proper, the Court is to apply an objective test which focuses on "the facts available to the officers at the moment of arrest." Beck v. Ohio, 379 U.S. 89, 96 (1964); Barna, 42 F.3d at 819 (3d Cir. 1994).

With respect to a search warrant, it is well-established that a totality-of-the-circumstances approach is to be employed in determining whether probable cause exists to support its issuance. Illinois v. Gates, 462 U.S. 213, 238 (1983). The Supreme Court has explained that the concept of "probable cause" is to be understood as "a fair probability that contraband or evidence of a crime will be found in a particular place." Id.; see also United States v. Price, 558 F.3d 270, 282 (3d Cir. 2009). The magistrate judge reviewing the affidavit in support of the warrant is entitled to make "a practical, common-sense decision [that probable cause exists], given all the circumstances set forth in the affidavit before him." Illinois, 462 U.S. at 238.

In general, the question of whether probable cause existed for a police officer to support an arrest or search warrant is a fact question for the jury.  <u>Sherwood</u>, 113 F.3d at 401 (citing <u>Groman v. Tp. of Manalapan</u>, 47 F.3d 628, 635 (3d Cir. 1995)).  It is appropriate to decide the issue at the summary judgment stage, however, when the court concludes "that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding."  <u>Id.</u>

C.  <u>Pennsylvania State Law Claims</u>[6]

1.  False arrest and false imprisonment

Under Pennsylvania law, the claims of false arrest and false imprisonment are coextensive.  <u>See</u> <u>Glass v. City of Phila.</u>, 455 F. Supp. 2d 302, 365 (E.D. Pa. 2006) (citing <u>Olender v. Tp. of Bensalem</u>, 32 F. Supp. 2d 775, 791 (E.D. Pa. 1999)); <u>Brockington v. City of Phila.</u>, 354 F. Supp. 2d 563, 572, n.10 (E.D. Pa. 2005) (internal citation omitted).  Similarly, under Pennsylvania law, "the elements of false imprisonment are (1) the detention of another person, and (2) the unlawfulness of such detention."  <u>Renk v. City of Pittsburgh</u>, 641 A.2d 289, 293

---

[6]  With respect to the analysis of the § 1983 claims and the Pennsylvania claims for false arrest and malicious prosecution, it must be noted that these state and federal causes of action are coextensive as to elements of proof and damages.  <u>Patzig v. O'Neil</u>, 577 F.2d 841, 851 (3d Cir. 1978).  Therefore, to the extent that the § 1983 claims are resolved, it is unnecessary to engage in a redundant analysis of the corresponding Pennsylvania state law claims.

(Pa. 1994).  Probable cause for an arrest will defeat actions
for both false arrest and false imprisonment.  <u>Glass</u>, 455 F.
Supp. 2d at 365 (citing <u>Gilbert v. Feld</u>, 842 F. Supp. 803, 821
(E.D. Pa. 1993)).  The standards for the existence of probable
cause are the same under Pennsylvania and federal law.  <u>See</u>
<u>Russoli v. Salisbury Tp.</u>, 126 F. Supp. 2d 821, 869 (E.D. Pa.
2000); <u>Renk</u>, 641 A.2d at 293 ("Probable cause exists when the
facts and circumstances which are within the knowledge of the
police officer at the time of the arrest, and of which he has
reasonably trustworthy information, are sufficient to warrant a
man of reasonable caution in the belief that the suspect has
committed or is committing a crime.") (internal citation and
quotation marks omitted).

  2. Malicious prosecution

   Under Pennsylvania law, a claim for malicious
prosecution requires a showing of the following elements: (1)
the defendant initiated a criminal proceeding; (2) the criminal
proceeding ended in plaintiff's favor; (3) the proceeding was
initiated without probable cause; and (4) the defendant acted
maliciously or for a purpose other than bringing the plaintiff
to justice.  <u>Donahue v. Gavin</u>, 280 F.3d 371, 379 (3d Cir. 2002);
<u>Merkle</u>, 211 F.3d at 791 (internal citation omitted).  A
plaintiff's failure to satisfy any one of these elements is
"fatal" to the assertion of a claim for malicious prosecution.

See Kossler, 564 F.3d at 186 (observing that, in a claim for malicious prosecution under § 1983, plaintiff's failure to establish an element of claim "was fatal" and noting that the analysis is identical under Pennsylvania law).  Therefore, as with a claim under § 1983, the existence of probable cause vitiates a cause of action for malicious prosecution under Pennsylvania law.

### 3.  Abuse of process

Abuse of process is a common law tort recognized in Pennsylvania as "the perversion of legal process after it has begun 'primarily to accomplish a purpose for which it is not designed.'"  Ciolli v. Iravani, 625 F. Supp. 2d 276, 296 (E.D. Pa. 2009)( Davis, J.) (quoting Werner v. Plater-Zyberk, 799 A.2d 776, 785 (Pa. Super. Ct. 2002)).  "In other words, abuse of process involves the 'use of legal process as a tactical weapon to coerce a desired result that is not the legitimate object of the process.'"  Id. (quoting Al Hamilton Contracting Co. v. Cowder, 644 A.2d 188, 191 (Pa. Super. Ct. 1994)).  To establish a claim for abuse of process, a plaintiff must be able to show that a defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff.  Harris v. Brill, 844 A.2d 567, 572 (Pa. Super. Ct. 2004) (quoting Werner, 799 A.2d at 785).  "Thus, the gravamen of this

tort is the perversion of legal process to benefit someone in achieving a purpose which is not an authorized goal of the procedure in question." Id.

The absence of probable cause to initiate criminal proceedings can be a sufficient ground on which to base an abuse of process claim. See Roskos v. Sugarloaf Tp., 295 F.Supp. 2d 480, 491 (M.D. Pa. 2003) (holding that an allegation that criminal proceedings were instituted without probable cause was sufficient to plead a cause of action for abuse of process). Unlike the preceding claims, however, the existence of probable cause does not itself negate a claim for abuse of process. See Jennings v. Shuman, 567 F.2d 1213, 1217 (3d Cir. 1977) (agreeing with the argument that regardless of whether the initial process is initiated with probable cause, if the claim is thereafter used for an unlawful purpose, a claim of abuse of process exists under Pennsylvania law); Lerner v. Lerner, 954 A.2d 1229, 1238 (Pa. Super. Ct. 2008) (stating that it is immaterial that criminal proceedings were commenced based on probable cause) (citing Rosen v. Am. Bank of Rolla, 627 A.2d 190, 192 (Pa. Super. Ct. 1993)); Shiner v. Moriarty, 706 A.2d 1228, 1236-37 (Pa. Super. Ct. 1998) (stating that probable cause is not an element of abuse of process claim). If probable cause does exist, such that the institution of criminal proceedings were a valid exercise of process, then a plaintiff must be able to

prove some "perversion" of the legal system occurred in the
course of these criminal proceedings to successfully assert an
abuse of process claim.  See e.g., Rosen v. Tesoro Petroleum
Corp., 582 A.2d 27, 33 (Pa. Super. Ct. 1990) (noting that
typical form of abuse of process is blackmail by means of arrest
or criminal prosecution) (internal citation omitted).

    4.   Civil conspiracy

      Civil conspiracy is defined under Pennsylvania law as
a "combination of two or more persons to do an unlawful or
criminal act or to do a lawful act by unlawful means or for an
unlawful purpose."  Ammlung v. City of Chester, 494 F.2d 811,
814 (3d Cir. 1974) (internal citation omitted); see also,
Franklin Music v. Am. Broad. Co., 616 F.2d 528, 535 (3d Cir.
979); Doltz v. Harris & Assocs., 280 F. Supp. 2d 377, 389 (E.D.
Pa. 2003) (Baylson, J.) (defining civil conspiracy as "the
agreement of two or more entities or individuals to engage in an
unlawful act, or an otherwise lawful act by unlawful means, when
some overt act is taken in furtherance of the conspiracy and
some actual legal harm accrues to the plaintiff.") (internal
citations omitted).  In order to prove the existence of a civil
conspiracy under Pennsylvania law, a plaintiff is required to
establish the following elements: (1) a combination of two or
more persons acting with a common purpose to do an unlawful act
or to do a lawful act by unlawful means or for an unlawful

purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003) (citing Strickland v. Univ. of Scranton, 700 A.2d 979, 987-988 (Pa. Super. Ct. 1997)); Kline v. Sec. Guards, Inc., 386 F.3d 246, 262 (3d Cir. 2004).  The existence of an "agreement" is the sine qua non of a civil conspiracy.  Spencer v. Steinman, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997).

## III. KELLY'S MOTION FOR SUMMARY JUDGMENT

Defendant Kelly contends that summary judgment is appropriate because no evidence has been submitted to show his involvement with the Investigation in any other aspect than obtaining Lofland's consent to have her conversations recorded. In accordance with the Court's November 8, 2007 Order, Plaintiff's claims could proceed against Defendant Kelly only for his investigatory role, and not his actions in his prosecutorial role.  Tellingly, Plaintiff has not submitted a response to Defendant Kelly's motion for summary judgment.

Kelly argues that he acted in no role other than that of prosecutor and that his lone involvement with the prosecution of this case was to obtain the consent of Lofland prior to the recording of her conversations, in accordance with the statutory requirements under the Pennsylvania Wiretap Act.  18 Pa. C.S. §

5704(2)(ii).  The Pennsylvania Wiretap Act expressly requires

that a prosecutor be involved with the acquisition of the

voluntary consent of an individual who agrees to consensual

intercepts.  The relevant text of the statute provides:

> It shall not be unlawful and no prior court
> approval shall be required under this chapter for
>
> (2) Any investigative or law enforcement officer
> or any person acting at the direction or request
> of an investigative or law enforcement officer to
> intercept a wire, electronic or oral communication
> involving suspected criminal activities,
> including, but not limited to, the crimes
> enumerated in section 5708 (relating to order
> authorizing interception of wire, electronic or
> oral communications), where:
>
> > (ii) one of the parties to the communication
> > has given prior consent to such interception.
> > **However, no interception under this paragraph
> > shall be made unless the Attorney General or
> > a deputy attorney general designated in
> > writing by the Attorney General, or the
> > district attorney, or an assistant district
> > attorney designated in writing by the
> > district attorney, of the county wherein the
> > interception is to be made, has reviewed the
> > facts and is satisfied that the consent is
> > voluntary and has given prior approval for
> > the interception;** however such interception
> > shall be subject to the recording and record
> > keeping requirements of section 5714(a)
> > (relating to recording of intercepted
> > communications) and that the Attorney
> > General, deputy attorney general, district
> > attorney or assistant district attorney
> > authorizing the interception shall be the
> > custodian of recorded evidence obtained
> > therefrom.

Id. (emphasis added).  Kelly relies on his deposition testimony

which establishes that his participation in the Investigation

was limited to: (1) a brief discussion with the investigating officers in order to support a finding that the conversations sought to be recorded pertained to criminal activity; and (2) an in-person interview with Lofland in order to ensure that her consent was voluntary. (Kelly Dep. 13:14-14:9; 30:3-32:14, Aug. 7, 2008.) Therefore, Kelly contends that his actions with respect to the Investigation were limited to his prosecutorial duty as required by the Pennsylvania Wiretap Act.

In support of his argument that he was not involved in the Investigation after obtaining Lofland's consent, Kelly cites to testimony from Cahill establishing that Patrick Carmody, a first deputy district attorney with the Chester County District Attorney's Office, and not Kelly, was consulted during the Investigation with respect to continuation of the consensual intercepts. (Cahill Dep. 141:9-25.) Kelly further notes that Dykes testified that the Search Warrant Affidavit that was prepared was reviewed by Patrick Carmody rather than Kelly. (Dykes Dep. 215:25-216:22.) Furthermore, Kelly testified that he did not have any involvement in deciding what charges should be brought against Plaintiff or in drafting the Criminal Complaint. (Kelly Dep. 53:4-54:15.)

It is well-established that prosecutors are subject to absolute immunity from civil liability with respect to decisions to prosecute. See Van de Kamp v. Goldstein, 129 S. Ct. 855,

44

860-61 (2009); Imbler v. Pactman, 424 U.S. 409, 430-31 (1976).

The scope of this immunity does not extend to actions taken in

an investigatory capacity.  Van de Kamp, 129 S. Ct. at 861-62;

Hartman v. Moore, 547 U.S. 250, 262 n.8 (2006); Buckley v.

Fitzsimmons, 509 U.S. 259, 273 (1993) ("A prosecutor's

administrative duties and those investigatory functions that do

not relate to an advocate's preparation for the initiation of a

prosecution or for judicial proceedings are not entitled to

absolute immunity.") (internal citation omitted).  The November

8, 2007 Order entered by the Court recognized this limitation

and permitted Plaintiff's claims against Kelly to proceed only

to the extent they involved investigatory conduct.

Pennsylvania law provides absolute immunity similar

to, but broader than, the immunity established in Imbler.

Durham v. McElynn, 772 A.2d 68, 60 (Pa. 2001).  Pennsylvania law

provides absolute immunity which is "unlimited" and protects

"high public officials . . . from suits seeking damages for

actions taken or statements made in the course of their official

duties . . . . even statements or actions motivated by malice,

provided the statements are made or the actions are taken in the

course of the official's duties or powers and within the scope

of his authority, or as it is sometimes expressed, within his

jurisdiction . . . ."  Id. (internal citation omitted).

Therefore, Kelly is entitled to absolute immunity with respect

to Plaintiff's alleged state law tort claims.  See <u>Domenech v.</u>
<u>City of Phila.</u>, Civ. A. No. 06-CV-1325, 2007 WL 172375, at *4
(E.D. Pa. Jan. 18, 2007) (Surrick, J.) (dismissing claims of
malicious prosecution, false arrest and intentional infliction
of emotional distress on grounds that assistant district
attorney is immune from suit arising from conduct of his
official duties).

In short, Plaintiff has presented no evidence that
Defendant Kelly was involved in the Investigation of the Planned
Robbery.  Thus, as Plaintiff has failed to present a mere
scintilla of evidence to establish Kelly's connection with the
Investigation, Plaintiff's arrest, or Plaintiff's trial, summary
judgment is appropriate with respect to all claims against
Kelly.


## IV.  DYKES AND CAHILL'S MOTIONS FOR SUMMARY JUDGMENT

As both of these Defendants' motions cover essentially
identical facts and legal issues, they are addressed together
for purposes of this Memorandum.  Plaintiff has filed a joint
response to these motions.  In the event that any meaningful
distinctions need to be drawn, they are presented herein.

### A.  <u>Probable Cause Analysis</u>

The crux of Plaintiff's claims boil down to an
examination of whether the Affidavits prepared by Dykes, Cahill,

and Carabba pass constitutional muster.  As explained above, the guiding principle of whether the Affidavits were sufficient turns on a finding of the existence of probable cause.  Since a determination of whether probable cause existed to support the search of Plaintiff's apartment and his subsequent arrest largely resolves Plaintiff's asserted claims, it is appropriate at the outset to engage in a preliminary probable cause analysis.  It is first necessary to examine the Affidavits as they were presented to determine whether probable cause existed on their face.  Upon making this determination, it is necessary to apply the <u>Franks</u> framework set forth above in order to address whether any of the deficiencies alleged by Plaintiff, i.e., the misstatements and omissions, serve to undermine the finding of probable cause.

        1.    Search warrant affidavit

      The Search Warrant Affidavit provides the following facts in support of a finding of probable cause:

      (1) a named informant (Lofland) who was familiar with Plaintiff stated that she discussed robbing a specific bank (Commerce Bank) in a specific location (Westtown Township, Pennsylvania).

      (2) Lofland disclosed the proposed strategy for the robbery in detail, stating that she would drive Plaintiff to the bank, Plaintiff would enter with a toy gun wrapped in black tape

and announce the robbery, and Plaintiff would abscond with the stolen money by hand.

(3) Lofland stated that Plaintiff intended to dye his hair blonde for the robbery.

(4) Lofland stated that Plaintiff had conducted internet research of banks in the area in preparation for a robbery.

(5) Police surveillance revealed that Plaintiff stated to Lofland that he needed money to purchase blonde hair dye and electrical tape for the robbery.

(6) Police surveillance revealed that Lofland drove Plaintiff to the intended location of the robbery (Commerce Bank) and Lofland and Plaintiff discussed where the vehicles used for the robbery would be parked as well as the intended escape route for the robbery.

(7) Police surveillance revealed that Plaintiff advised Lofland that she should report her truck stolen in order to use it for the robbery.

(8) Lofland drove Plaintiff to a drug store during which time Plaintiff and Lofland agreed that he should purchase blonde hair dye and Plaintiff asked a store clerk where the blonde hair dye and electrical tape were located. Police surveillance confirmed that Plaintiff carried a small plastic bag with him from the drug store to his apartment.

(9) Lofland stated that Plaintiff contacted her and discussed looking through his son's toy guns in order to find one that could be used for the bank robbery.

(10) Lofland reported that she meet with Plaintiff at his apartment, and that Plaintiff's hair was dyed blonde, that he had typed a demand note for the bank robbery on his computer and printed it out.

(11) Plaintiff was planning on robbing the bank the day the Search Warrant Affidavit was submitted. (Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. F.)

Based upon these particular and specific facts, the reviewing magistrate was entitled to reach the commonsense conclusion that probable caused existed to justify approval of a search warrant. See Illinois, 462 U.S. at 238.

    2.   Criminal complaint affidavit

The Criminal Complaint Affidavit includes the same facts recited above, but also includes these additional facts in support of Plaintiff's arrest:

(1) Lofland stated that Plaintiff showed her the toy gun and folder that he was going to use in the robbery.

(2) Police surveillance observed Lofland drive Plaintiff to Commerce Bank, Plaintiff enter the lobby of Commerce Bank "appearing to use the Mac machine," and then looking into the lobby of Commerce Bank before exiting a few

seconds later.

(3) Plaintiff told Lofland to drive him to the park where they had discussed planting a vehicle for use after the robbery so he "could determine the amount of time it would take them to get to the park and change vehicles." Plaintiff instructed Lofland where to park the vehicles and had Lofland drive him back to his apartment while timing this trip.

(4) Lofland reported that Plaintiff instructed her to take the clothing that he wore during the robbery and throw it in a dumpster.

(5) Lofland stated that Plaintiff told her that he would complete the robbery on May 8, 2006, and that upon Lofland's arrival at his apartment, he would have his hair dyed blonde. When Lofland arrived at Plaintiff's apartment he was in the process of dyeing his hair. Plaintiff told Lofland to place his change of clothes in her vehicle.

(6) Plaintiff prepared a demand note on his computer.

(7) After execution of the search warrant, the following items were recovered from Plaintiff's apartment: a toy gun wrapped in black tape, a bank robbery demand note, an empty hair dye container, and a black leather folder.

(Defs.' Mots. for Summ. J., Ex. 1.)

The additional facts provided in the Criminal Complaint Affidavit also support a finding of probable cause

with respect to the Planned Robbery.  The recovery of the toy gun with tape, a demand note, a hair dye container and the black leather folder were all highly probative of Plaintiff's intent to commit the Planned Robbery.

It must be noted that each of these Affidavits were approved by a magistrate judge, and therefore the finding in favor of probable cause is entitled to great deference.  United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (noting that a district court, must "give great deference to the magistrate judge's probable cause determination") (internal citations omitted); United States v. Loy, 191 F.3d 360, 365 (3d Cir. 1999).  A reviewing court should uphold the finding of probable cause if the Affidavits upon which it was based provided a substantial basis for the magistrate judge to reach that conclusion.  Hodge, 246 F.3d at 305; United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993).  In other words, the "Court need not determine whether probable cause actually existed, but only whether there was "a 'substantial basis' for finding probable cause."  Hodge, 246 F.3d at 305 (quoting United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993)).  In conducting this review, the Court is confined "'to the facts that were before the magistrate judge, i.e., the affidavit, and [does] not consider information from other portions of the record.'"  Id. (quoting Jones, 994 F.2d at 1055).

Based upon the facts recited above, it is clear from the face of the Affidavits that a substantial basis existed for a finding of probable cause. The Affidavits establish that a named informant (Lofland) was familiar with Plaintiff and had significant discussions with him regarding the Planned Robbery of Commerce Bank. It is true that informants are not presumed to be credible, however, where the government can provide corroboration of the information provided, the information supplied by an informant is to be afforded weight. See United States v. Yusuf, 461 F.3d 374, 384-85 (3d Cir. 2006) (stating that an informant can be deemed credible where the government corroborates the information provided through independent investigation). Here, the information provided from Lofland was confirmed independently by Dykes and Cahill through the Investigation.

Moreover, the fact that Lofland was named in the Affidavits, rather than a confidential informant, and was available to testify in court to the information, bolsters the credibility of the information provided. See Florida v. J.L., 529 U.S. 266, 270 (2000)(observing that one of the characteristics of a known informant that contributes to reliability is the concept of accountability for the allegations made)(internal citation omitted); United States v. Nelson, 284 F.3d 472, 482 (3d Cir. 2002) (same); United States v. Brown, 93

Fed. Appx. 454, 456 (3d Cir. 2004) (non-precedential opinion) ("The affidavit's recitation of the informant's availability to have his veracity tested at all court proceedings also bolstered the reliability of the informant's information.")

Furthermore, the Affidavits provide sufficient specificity as to the details of the Planned Robbery creating the indicia of reliability necessary for a finding of probable cause. More specifically, the Affidavits detail that Lofland would drive while Plaintiff would actually go into Commerce Bank, that Plaintiff would use a toy gun wrapped in black tape, and that Plaintiff would disguise his appearance with blonde hair dye. The Affidavits also state that Plaintiff and Lofland surveyed Commerce Bank and developed a plan to evade the police after the Planned Robbery. Furthermore, the Criminal Complaint Affidavit stated that items related to the Planned Robbery; a toy gun wrapped in black tape, a bank robbery demand note, an empty hair dye container, and a black leather folder; were all found in Plaintiff's apartment. The recovery of these items confirmed the information contained in the Search Warrant Affidavit. In light of the great deference to be afforded to a magistrate judge's determination of probable cause, the Court has no trouble concluding that probable cause existed to support the search warrant and the criminal complaint.

3. Alleged misstatements in the Affidavits

Since the Affidavits establish probable cause on their face, Plaintiff must show that the alleged misstatements or omissions were included with reckless disregard for the truth and would negate the original finding of probable cause. Plaintiff recites a litany of misstatements or omissions which purportedly render the Affidavits insufficient to establish probable cause.

Plaintiff relies upon the following alleged misstatements in support of his argument that the Affidavits were invalid.

> (1) That Plaintiff "was planning to rob the Commerce Bank, within the next week or two," when Lofland actually told Dykes and Cahill that Plaintiff planned on robbing the bank on April 18, 2006, between 1:30 and 2:00 p.m.

Plaintiff is correct that Lofland did state that the Planned Robbery was originally planned for April 18, 2006, rather than providing the generic time of the "next week or two." Assuming arguendo that this statement was included with reckless disregard for the truth, this statement was not material to a finding of probable cause. If anything, this statement provided more specific information with respect to Lofland's knowledge of the Planned Robbery and supported a finding of probable cause.

> (2) That Plaintiff "talked about a robbery and shooting that happened a few years ago, across the street from the Golf Club Apartments, at the House of Lights," although Plaintiff was never a suspect in the investigation.

54

Plaintiff cannot establish that this constitutes a
material misstatement.  The fact that Plaintiff was not a
suspect in the investigation of the House of Lights Incident
does not mean that he did not discuss it with Lofland.  At best,
Plaintiff may argue that this statement creates a "misstatement
by implication" on the ground that it implies Plaintiff was
involved in the House of Lights Incident.  Even assuming that
this "misstatement" existed, it was not material to a finding of
probable cause.  This information is completely unrelated to the
Planned Robbery and there was more than sufficient evidence, as
recited above, to support a finding of probable cause with
respect to the Planned Robbery.

> (3) That Plaintiff advised Lofland that he "needed to
> get the hair dye and electrical tape but did not have
> any money," while it was actually Lofland who
> suggested that they go to the drugstore to obtain the
> hair dye.

Plaintiff is correct that the April 17 Intercept
reflects that Lofland first suggested that they go to CVS to get
the hair dye.  (Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. L.
4.)  The April 17 Intercept does not reveal a statement by
Plaintiff that he needed to get the hair dye and tape but was
not able to do so because he did not have any money.  Therefore,
this would qualify as a misstatement since it was made with at
least a reckless disregard for the truth.

This misstatement is minor, however, and was not

55

material to the original finding of probable cause.  Even if
Lofland was the one who suggested that she and Plaintiff go to
CVS to procure the hair dye, Plaintiff was at least complicit in
purchasing the hair dye.  This indicated his cooperation with
the execution of the Planned Robbery and supports a finding of
probable cause.

> (4) That "on 4/18/2006, police conducted surveillance
> as Lofland drove Teeple to the Eckerd Drug store," is
> a misstatement because it implies that Plaintiff
> wanted to go to the Eckerd Pharmacy while Lofland was
> the person who actually suggested they go to Eckerd
> Pharmacy.

First, Plaintiff does not dispute that this statement
is true on its face.  Second, even if there is an implication
created by this statement, it would not qualify as a material
misstatement.  As with the preceding statement, even if Lofland
was the one who suggested that they travel to the Eckerd
Pharmacy, Plaintiff agreed to accompany her there, which
indicates that he intended to follow through with the Planned
Robbery.

> (5) That the statement indicating that Plaintiff asked
> Lofland what type of hair dye he should purchase and
> also asked the store clerk where the hair dye and
> electrical tape were located is a misstatement because
> Lofland actually suggested the blonde hair dye to
> Plaintiff and Lofland was the one who asked the clerk
> where these items were located.

There was no transcript created for the intercept of
the conversation between Plaintiff and Lofland which occurred at
the Eckerd Pharmacy on April 18, 2006.  Therefore, it is

difficult to confirm the accuracy of the above statement. Plaintiff relies upon Dykes' deposition testimony in which he purportedly agrees with Plaintiff's position that Lofland suggested the blonde hair dye and asked the clerk for the hair dye and electrical tape. (Dykes Dep. 258:5-270:24.) The deposition testimony cited by Plaintiff is somewhat inconclusive on this point, but indicates that Dykes did hear Lofland first suggest the blonde hair dye and also ask the clerk where the hair dye and tape were located. (Id.)

Again, however, these minor inconsistencies were not material to a finding of probable cause. Even assuming they were correct, the fact that Lofland was partly responsible for obtaining these items does not indicate that Plaintiff did not want to participate in the Planned Robbery. Accepting as true that Lofland selected the hair dye and electrical tape and purchased them, these facts are irrelevant to a finding of probable cause.

> (6) That the statement that "[d]uring their travel back to Teeple's apartment, Teeple suggested Lofland report her truck stolen from the Wawa in West Chester," was inaccurate because Lofland made this suggestion rather than Plaintiff.

A review of the April 18 Intercept reveals the following discourse between Plaintiff and Lofland:

> **Lofland:** So when I call the police department to, to, uh call this in, how should I say, where should I say it was stolen at from Wawa or the driveway?
> **Plaintiff:** I think Wawa would be better.

(Defs.' Mot. for Summ. J., Ex. 11.)  Plaintiff attempts to argue that the statement that Plaintiff "suggested" to Lofland to report her truck stolen was inaccurate because Lofland was the person who first brought up the idea of reporting the truck as stolen.  This argument is inapposite.  Plaintiff emphasizes nothing more than a potential linguistic ambiguity.  Lofland presented two options to Plaintiff with respect to reporting her truck as stolen, and Plaintiff suggested that it would be better to report it as being stolen from Wawa.  Plaintiff cannot establish that the statement that he "suggested" that Lofland report her truck stolen from Wawa is an inaccurate interpretation of the transcript.  Therefore, the inclusion of the challenged statement cannot be classified as being included with reckless disregard for the truth pursuant to a <u>Franks</u> analysis.

> (7) That the statement that "[w]hen Lofland refused to get Teeple more vicodin he became hostile," was a misstatement because Plaintiff never acted hostile toward Lofland.

The transcript recorded on May 8, 2006, clearly memorializes Lofland stating that Plaintiff is "in a pissy mood."  (Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. S.)  The transcript also reveals Lofland telling Plaintiff "you're freaking out," and then Lofland immediately relaying to Dykes that Plaintiff was "freaking out."  (<u>Id.</u>)  Lofland clearly articulated that Plaintiff was "freaking out," which supports a

statement that Plaintiff was acting hostile.  Based upon these undisputed statements, the characterization of Plaintiff as acting hostile toward Lofland does not qualify as a misstatement as Dykes had no reason to doubt it validity.

With respect to each of these alleged misstatements, Plaintiff either fails to demonstrate that an actual misstatement was included, or that the misstatements that were included, if "corrected" in conformity with Plaintiff's version of the relevant events, would not support a finding of probable cause.

4.   Alleged omissions from the Affidavits

Plaintiff recites numerous omissions which he alleges should have been included in the Affidavits.  Although many of these alleged omissions are patently without merit, they are listed below:

(1) Cahill knew that Lofland was arrested for cruelty to animals;

(2) Lofland had three prior convictions for retail theft and an open warrant for bad checks;

(3) Lofland was dating Police Officer Robert Kinch of the Westtown-East Goshen Regional Police Department prior to April 11, 2006;

(4) Dykes referred the information he received from Lofland about the House of Lights Incident and learned that Plaintiff

was not a suspect;

(5) Defendants did nothing to corroborate Lofland's claims about Plaintiff's financial status;

(6) Lofland told Dykes that the Planned Robbery was scheduled for April 18, 2006 at 2:00 PM;[7]

(7) Lofland's statement that Plaintiff was addicted to pain killers and that she drove Plaintiff to get them;

(8) Plaintiff had loaned Lofland $9,000 which she had not repaid;

(9) during the April 13 Intercept, Lofland told Plaintiff not to tell his girlfriend about the Planned Robbery;

(10) Plaintiff did not purchase the hair dye and electrical tape on April 17, 2006, after Plaintiff stated that he would do so;

(11) Plaintiff called Lofland on April 17, 2006, and told her he could not participate in the Planned Robbery on the scheduled date of April 18, 2006, because he had an appointment at the welfare office;[8]

(12) Lofland took Plaintiff to the Eckerd Drug Store on April 20, 2006, to pick up a prescription for 110 Ultram pills;

---

[7]    Plaintiff includes this statement in both his alleged misstatements and omissions.  The impact of this statement is addressed above regarding the alleged misstatements, and therefore it need not be addressed in this section.

[8]    This alleged omission is clearly included in the Search Warrant Affidavit, which states "[l]ater that date [April 17, 2006] Teeple informed Lofland that he was not going to do the robbery tomorrow [because] he had an appointment," (Pl.'s Resp. to Defs.' Mots. for Summ. J., Ex. F.)

(13) the conversation between Plaintiff and Lofland on April 22, 2006, referenced in paragraph 7 of the Search Warrant Affidavit, was not recorded;[9]

(14) on April 23, 2006, Plaintiff called Lofland and told her that he was not going to participate in the Planned Robbery;

(15) during the April 23, 2006 conversation, after Plaintiff told Lofland he did not want to do the Planned Robbery, she responded that she already reported her truck as stolen to persuade him to participate in the Planned Robbery;

(16) Defendants conducted surveillance of Plaintiff on April 24, 2006, but did not uncover anything indicating that Plaintiff would participate in the Planned Robbery;

(17) on April 24, 2006, Plaintiff contacted Lofland but did not discuss the Planned Robbery;

(18) on April 25, 2006, Dykes and Cahill sent Lofland to Plaintiff's apartment in order to have her re-engage him in discussions about the Planned Robbery, but Plaintiff did not discuss the Planned Robbery during this conversation;

(19) Plaintiff told Lofland that he would contact her on April 30, 2006, in order to finalize the strategy for the Planned Robbery but no consensual intercept of any conversations on April 30, 2006, occurred;

_____

[9]    The Search Warrant Affidavit does not state that this conversation was intercepted, in contrast to other portions of the Affidavits which clearly reflect that a conversation was intercepted.

(20) on May 1, 2006, Lofland attempted to convince Plaintiff to complete the Planned Robbery by saying that they should do something "exciting" and Plaintiff refused to participate even when Lofland offered him Percocet;

(21) no investigation was done by Defendants on May 2, 2006;

(22) the May 3, 2006 conversation between Plaintiff and Lofland in which they discussed the "dry run" of the Planned Robbery was not recorded;

(23) during the May 3 Intercept, Lofland gave Plaintiff fifteen Vicodin pills;

(24) on May 4, 2006, Lofland left Plaintiff a "nasty" phone message in order to pressure him to go through with the Planned Robbery but then called back and left a "nicer" message at the direction of Dykes and Cahill;

(25) on May 4, 2006, Lofland went to Plaintiff's apartment and attempted to persuade him to participate in the Planned Robbery by promising sexual favors, reminding him of his financial problems and impending eviction proceeding, and stating it was the "perfect day" for the Planned Robbery;

(26) no investigation was conducted on May 5, 6, or 7, 2006;

(27) the May 7, 2006 conversation between Lofland and Plaintiff, referenced in paragraph 10 of the Criminal Complaint Affidavit, was not recorded and was not corroborated by Defendants;[10]

---

[10]    The Criminal Complaint Affidavit does not state that this conversation was intercepted, in contrast to other portions

(28) the May 8, 2006 conversation between Lofland and Plaintiff, referenced in paragraph 11 of the Criminal Complaint Affidavit, was not recorded and was not corroborated by Defendants;[11]

(29) the information that Dykes and Cahill received from Lofland on May 8, 2006, regarding Plaintiff dyeing his hair, instructing Lofland to place a change of clothes in her car, and preparing a demand letter on his computer was not recorded or independently corroborated;

(30) during the May 8 Intercept, Lofland stated "he's a pain in the ass," "I'm gonna jack him up," and "before the day is out, I'm gonna get him," with regard to Plaintiff;

(31) before arriving at Plaintiff's apartment on May 8, 2006, Lofland told Plaintiff that she had just been at the pharmacy;

(32) after Plaintiff told Lofland that he would not commit the Planned Robbery on May 8, 2006, Lofland went back to her car and received instructions via cell phone from Dykes and Cahill that she should attempt to persuade Plaintiff to commit the Planned Robbery and that Lofland attempted to persuade Plaintiff to commit the Planned Robbery by reminding him of his financial problems and promising him pills;

---

of the Affidavits which clearly reflect that a conversation was intercepted.

[11] The Criminal Complaint Affidavit does not state that this conversation was intercepted, in contrast to other portions of the Affidavits which clearly reflect that a conversation was intercepted.

(33) during the execution of the search warrant on May 8 2006, the typed robbery demand note was found in the trash can torn into pieces and the computer that was recovered from Plaintiff's apartment did not contain any information that corroborated Lofland's claim that Plaintiff was conducting internet research for the Planned Robbery;

(34) while in custody Plaintiff gave a statement that he was not the one who devised the Planned Robbery, but rather it was Lofland's idea; and

(35) Lofland had a secret deal with Defendants that if she cooperated with the Investigation then she would have her probation and community service terminated.

(Pl.'s Resp. to Defs.' Mot. Summ. J. 12-19.).

In the interest of efficiency and judicial economy, and because ultimately they are without significance separately or together, this Memorandum will not address each of these alleged omissions independently. Plaintiff's litany of alleged omissions are replete with statements that do not comport with the facts contained in the record, and often represent a thinly veiled attempt to manipulate the record to create an "omission" where none really exists. Even assuming that all of these alleged omissions are factually accurate, they do not rise to the level of materiality necessary to find that the Affidavits were invalid under a <u>Franks</u> analysis.

Plaintiff seizes on minor omissions or inconsistencies contained in the Affidavits in order to support his theory of the case, which is that Lofland was the driving force behind the Planned Robbery and that Plaintiff was only going along with her in order to obtain more prescription painkillers. The fatal defect with Plaintiff's argument is that he fails to recognize that even if these omissions support his theory, they fail to satisfy the two-pronged <u>Franks</u> analysis discussed above.

First, Plaintiff cannot demonstrate that these omissions were excluded with a reckless disregard for the truth. Most, if not all, of these alleged omissions do not constitute facts that a reasonable judge would want to know in analyzing whether probable cause existed. Plaintiff contends that these alleged omissions indicate that he did not truly intend to follow through with the Planned Robbery but was only feigning interest in order to obtain prescription pain medicine from Lofland.

It was not mandatory that Defendants include every piece of information that was uncovered during the course of the Investigation, even if that information could possibly cast doubt on the finding of probable cause. <u>See</u> <u>Wilson</u>, 212 F.3d at 787 (a court "cannot demand that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a

novelist or gossip"); DiNicola v. DiPaolo, 25 F. Supp. 2d 630, 663 (W.D. Pa. 1998) (concluding that "an affiant is not required to include in an affidavit of probable cause every piece of information gathered in the course of an investigation that might prove exculpatory") (citing Mays v. City of Dayton, 134 F.3d 809, 815 (6th Cir. 1998)). Therefore, Defendants were entitled to make the reasonable judgment that the alleged omissions would not be necessary for the magistrate judge to conduct an appropriate inquiry into probable cause.

Second, even assuming that these omissions were submitted in a "corrected" affidavit, they would not vitiate the original finding of probable cause. The fatal defect with Plaintiff's materiality argument is that he misunderstands the effect of including the alleged omissions in terms of his theory that probable cause would not have existed if they were included. Plaintiff argues that he was only feigning interest and going along with the Planned Robbery, and that his true motivation was to obtain prescription medications from Lofland. Reviewing the totality of information available to Defendants objectively, it was not possible for them to ascertain that Plaintiff was merely "playing along" for purposes of obtaining prescription drugs from Lofland. See Dintino v. Echols, 243 F. Supp. 2d 255, 263 (E.D. Pa. 2003) (noting that the determination of probable cause is an objective test based upon the available

66

facts and circumstances); see also Groman, 47 F.3d at 634-35

("The proper inquiry in a section 1983 claim based on false

arrest . . . is not whether the person arrested in fact

committed the offense but whether the arresting officers had

probable cause to believe the person arrested had committed the

offense." (quoting Dowling v. City of Phila., 855 F.2d 136, 141

(3d Cir. 1988)).

As discussed in detail above, there was more than

sufficient information for a finding of probable cause on the

face of the Affidavits.  At best, the "reconstructed" affidavit

proposed by Plaintiff demonstrates that: (1) Plaintiff wavered

on whether he wanted to commit the robbery; (2) Plaintiff was

addicted to prescription pain killers which he sometimes

obtained from Plaintiff; and (3) Lofland encouraged Plaintiff to

commit the Planned Robbery.  None of these facts, however,

undermine the finding of probable cause.  In other words, even

adjudging Plaintiff's version of the facts in the most favorable

light, it was at least as likely that he wanted to commit the

Planned Robbery as it was that he was only faking his interest.

Defendants were entitled to rely on the available information

and make a calculated decision that the facts and circumstances

presented reasonably indicated that an offense was being

committed by Plaintiff with respect to the Planned Robbery.  See

generally Orsatti, 71 F.3d at 483 ("[P]robable cause to arrest

67

exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.").

Plaintiff's argument that the inclusion of these alleged omissions would negate a finding of probable cause is unavailing for several reasons. First, the alleged omissions undoubtedly indicate that Plaintiff backed out of committing the Planned Robbery on several different occasions. There is contradictory information in the Affidavits, however, which shows that each time that Plaintiff repudiated his involvement in the Planned Robbery he would take a subsequent action to reaffirm his commitment. The strongest evidence of this is that the Affidavits state that on May 8, 2006 (the date of Plaintiff's arrest), he told Lofland that he was prepared to commit the Planned Robbery, that he dyed his hair blonde, that he was in possession of a toy gun covered with black tape, and a demand note was found in his trash can. Therefore, even if the alleged omissions indicating Plaintiff's vacillation with respect to the Planned Robbery were included, there were still sufficient facts to conclude that probable cause existed that Plaintiff intended to follow through with the Planned Robbery.

Second, the fact that Plaintiff obtained prescription pain medication from Lofland is not material to a finding of

probable cause.  Plaintiff argues that if the statements regarding Lofland's facilitation of Plaintiff's drug habit were included in the Affidavits, they would demonstrate that he was merely going along with the Planned Robbery to obtain drugs, thereby undermining probable cause.  This argument is unavailing.

Even if obtaining prescription drugs was Plaintiff's ulterior motive, the objective circumstances presented in the Affidavits do not support such a finding.  Plaintiff's undisputed actions, including, _inter alia_, taping the toy gun, dyeing his hair blonde, discussing the intimate details of the Planned Robbery, and typing up a demand note, all indicate that Plaintiff intended to participate in the Planned Robbery.  Simply put, Plaintiff's internal motive as to why he was going along with the Planned Robbery is irrelevant since there were sufficient objective indicia to support a finding of probable cause.

Third, Plaintiff recites _ad nauseum_ the facts indicating that Lofland attempted to persuade Plaintiff to commit the Planned Robbery.  This information is irrelevant.  Since Lofland was acting as an informant, it is reasonable to expect her to facilitate Plaintiff's participation in the Planned Robbery.  Assuming _arguendo_ that Lofland was characterized as the "mastermind" of the Planned Robbery, this

fact does not indicate that Plaintiff did not freely agree to participate in the Planned Robbery.  Based upon the information available to Defendants and presented in the Affidavits, even if the "omissions" showing that Lofland coaxed Plaintiff into participating were included, they would not undermine the finding that he actually intended to commit the Planned Robbery.

Based upon the foregoing analysis, it is clear that probable cause existed with respect to the Affidavits and the alleged misstatements and omissions relied upon Plaintiff do not vitiate the existence of probable cause.

B.    Qualified Immunity

Where probable cause exists for an arrest, the officer will be shielded by the doctrine of qualified immunity.  See e.g., Blaylock v. City of Phila., 504 F.3d 405, 411 (3d Cir. 2007) (finding that a defendant is entitled to qualified immunity "'if a reasonable officer could have believed that probable cause existed' in order to justify an arrest'in light of clearly established law and the information the [arresting] officers possessed.") (quoting Hunter v. Bryant, 502 U.S. 224, 228-29 (1991)); Gilles, 427 F.3d at 205 (finding that under the second step of the Saucier analysis, "a police officer is entitled to qualified immunity unless it would have been clear to a reasonable officer there was no probable cause to arrest").  Here, the Court concludes that probable cause existed to justify

Plaintiff's arrest.  Therefore, Dykes and Cahill are entitled to qualified immunity, and thus it is appropriate to grant summary judgment in their favor with respect to all outstanding claims.

C.    <u>False Arrest/Imprisonment and Malicious Prosecution</u>

Even assuming that Dykes and Cahill were not entitled to qualified immunity, the remaining claims against them cannot stand on the merits.  Claims for false arrest, false imprisonment and malicious prosecution under both § 1983 and Pennsylvania law require that Plaintiff show that no probable cause existed for his arrest.  <u>See</u> <u>Groman</u>, 47 F.3d at 634-35; <u>Glass</u>, 455 F. Supp. 2d at 365.  Thus, a finding of the existence of probable cause based upon the Affidavits negates Plaintiff's claims with respect to false arrest, false imprisonment and malicious prosecution.  As the Court finds that probable cause was established by the Affidavits, this finding renders summary judgment on all these claims appropriate in this case.

D.    <u>Abuse of Process</u>

Plaintiff fails to put forth any argument as to a genuine issue of material fact as to the abuse of process claims.  In order to successfully assert an abuse of process claim, Plaintiff must show that his criminal prosecution was instituted "primarily to accomplish a purpose for which the process was not designed."  <u>Harris</u>, 844 A.2d at 572 (internal citation omitted).  Although the existence of probable cause

alone is not dispositive, Plaintiff fails to point to any evidence in the record to indicate that his arrest or subsequent prosecution was a "perversion" of the legal process. See Ciolli, 625 F. Supp. 2d at 296 (defining an abuse of process claim as a "perversion of legal process"). Plaintiff's prosecution, although not ultimately successful, was justified in light of the available evidence. Therefore, summary judgment for Defendants is warranted on this claim.

      E.   Civil Conspiracy

Plaintiff's civil conspiracy claim fails for two reasons. First, civil conspiracy requires some type of agreement among the parties. See Phillips v. Seliq, 959 A.2d 420, 437 (Pa. Super. Ct. 2008) (establishing that a conspiracy under Pennsylvania law requires an agreement). "'The mere fact that two or more persons, each with the right to do a thing, happen to do that thing at the same time is not by itself an actionable conspiracy.'" Id. (quoting Fife v. Great At. & Pac. Tea Co., 52 A.2d 24, 39 (Pa. 1947)). Plaintiff does not identify one fact in the available record to indicate any type of agreement, implicit or otherwise, among Defendants in order to support the civil conspiracy claim. Second, as the Court concludes that probable cause existed for Plaintiff's arrest, Plaintiff is prevented from establishing a predicate offense for conspiracy under Pennsylvania law. See id. (recognizing that

"'absent a civil cause of action for a particular act, there can
be no cause of action for civil conspiracy to commit that
act.'") (quoting McKeeman v. Corestates Bank, N.A., 751 A.2d
655, 660 (Pa. Super. Ct. 2000)). As explained above, Defendants
are not liable for any of the causes of action asserted by
Plaintiff. Thus, no underlying wrongful act exists to support a
civil conspiracy claim. Therefore, judgment in favor of Dykes
and Cahill on this claim is appropriate as a matter of law.[12]


**V.    CARABBA'S MOTION FOR SUMMARY JUDGEMENT**

         Defendant Carabba contends that summary judgment is
appropriate with respect to all claims against him because his
only participation in the Investigation, Plaintiff's arrest, and
prosecution was limited strictly to preparing the Search Warrant
Affidavit. Plaintiff responds that Carabba was more involved
with the Investigation and participated in several of the
consensual intercepts during the Investigation.

         The extent of Carabba's role in the Investigation is
inapposite with respect to summary judgment. For the reasons
discussed above, even assuming that Carabba was involved in the

---

         [12]    Although Plaintiff asserts his civil conspiracy claim
under Pennsylvania law, an identical analysis would result if
this claim was asserted pursuant to § 1983. See Glass, 455 F.
Supp. 2d at 359 (rejecting plaintiff's civil conspiracy claim
under § 1983 because he failed to show his arrest was without
probable cause and could not establish an agreement among the
defendants).

Investigation, the existence of probable cause defeats Plaintiff's false arrest, false imprisonment and malicious prosecution claims under § 1983 and Pennsylvania law. As with Dykes and Cahill's motions for summary judgment, Plaintiff fails to address either the abuse of process claim or civil conspiracy claim. Since Plaintiff cannot raise a genuine issue of material fact, it is appropriate to grant summary judgment in favor of Carabba with respect to all claims asserted against him.

**VI. MOTIONS TO FILE REPLY BRIEFS**

Defendants Cahill and Dykes each filed a motion for leave to file a reply brief. Plaintiff opposes both of these motions. As summary judgment can be decided based upon the initial set of briefing, it is unnecessary to permit additional briefing on the issue. These motions will be denied.

**VII. CONCLUSION**

For these reasons, Defendants are entitled to judgment as a matter of law and each of Defendants' motions for summary judgment shall be granted . An appropriate order will issue.